UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEPHANIE L. HEAP,

                    Plaintiff,

-against-                                    18 Civ. 1220 (LAP)

CENTURYLINK, INC. and QWEST                  OPINION & ORDER
CORPORATION,

                    Defendants.

LORETTA A. PRESKA, Senior United States District Judge:

    Before the Court is a motion for summary judgment filed by

Defendants CenturyLink, Inc. and Qwest Corporation d/b/a

CenturyLink ("the Company").[1]  That motion is GRANTED IN PART and

---

[1] Not including the various declarations relied upon by the
parties, which the Court will cite ad hoc, the record on summary
judgment consists of the following:
  1) Company's Memorandum of Law in Support of Motion for Summary
     Judgment ("MSJ"), dated June 5, 2019 [dkt. no. 42];
  2) Company's L.R. 56.1 Statement of Undisputed Material Facts in
     Support of Motion for Summary Judgment ("Def. 56.1 Stmt."),
     dated June 5, 2019 [dkt. no. 43];
  3) Plaintiff's Memorandum of Law in Opposition to Company's
     Motion for Summary Judgment ("Opp."), dated July 10, 2019
     [dkt. no. 50];
  4) Plaintiff's Opposition to Company's L.R. 56.1 Statement and
     Statement of Disputed Facts ("Pl. 56.1 Opp." and "Pl. SDF"),
     dated July 11, 2019 [dkt. no. 51];
  5) Company's Reply in Support of Motion for Summary Judgment
     ("Reply"), dated July 31, 2019 [dkt. no. 57];
  6) Company's Reply to Plaintiff's Opposition to Company's L.R.
     56.1 Statement ("Def. Reply 56.1 Stmt."), dated July 31, 2019
     [dkt. no. 61]; and
  7) Company's Response to Plaintiff's Statement of Disputed Facts
     ("Opp. to Disputed Facts"), dated July 31, 2019 [dkt. no.
     62].

DENIED IN PART.  For the reasons detailed below, the Court grants summary judgment on Plaintiff Stephanie Heap's ("Heap") New York State Human Rights Law ("NYSHRL") claims, New York City Human Rights Law ("NYCHRL") claims, claim for unpaid commissions under Section 193 of the New York Labor Law ("NYLL"), and common law claims.  The Court denies summary judgment with respect to Heap's claim for unpaid commissions under Section 191 of the NYLL.

I.   FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the factual background of this litigation.  Accordingly, it will detail the relevant facts as concisely as possible. The factual background below will primarily be taken from Plaintiff's Local Rule 56.1 Opposition to the Company's Statement of Undisputed Facts ("Pl. 56.1 Opp."), Plaintiff's Local Rule 56.1 Statement of Disputed Facts ("Pl. SDF"), and, where the relevant facts are undisputed, from Defendants' Local Rule 56.1 submissions.

a. Gender Discrimination

Heap began working at the Company as a Global Accounts Manager ("GAM") in December 2014.  (Pl. SDF ¶¶ 1-2, 11.)  As a GAM, Heap's role with the Company was primarily supporting existing clients and would require her primarily to foster established relationships with clients rather than secure business from new clients.  (Id. at ¶¶ 12-13.)

When she was initially hired, Heap was paid a salary of $87,000 per year. (Id. at ¶ 7.) According to Heap, the Company had initially informed her that she would receive a base salary of $110,000 but decided to provide her with a lower salary after evaluating her prior work experience. (Id. at ¶¶ 5-6.) In addition to her base salary, Heap earned commissions that were calculated in accordance with the Company's 2015 and 2016 Sales Compensation Agreements and Sales Compensation Master Guides. (Id. ¶ 8.) Those agreements did not provide the value of specific inputs needed to quantify commissions, but they did provide the broad process for doing so. (Id.)

In April 2015, only a few months into her tenure at the Company, Heap's manager Thomas Martin ("Martin") convinced her to take on a new role as a Global Account Executive ("GAE"). In contrast to her role as a GAM, the GAE role would require Heap to go out and obtain new sales rather than foster existing client business. (Id. ¶ 17.) Martin felt that the new role would help her "focus on her strength which was account acquisition." (Id. ¶ 122.)

Heap was initially hesitant to take on the new role in part because it would be "much harder" than the old one, (id. ¶ 19), i.e., it would require her to go out and "hunt" new clients. Moreover, she had been very successful in the GAM role and had a nearly perfect year to date attainment rate against her sales quota. (Id. ¶ 124.) Ostensibly to ease her concerns, Martin told

Heap that she would be credited with an opportunity with a company named iQor, a new client account, which would make the transition smoother. (Id. ¶ 22.) As Heap put it, the iQor opportunity would give her sales credit that would translate into commissions under the various sales agreements. (Id. ¶ 24.) When the iQor sale closed in May 2015, Martin sent Heap an email attaching the contract for the opportunity congratulating her on her incoming commissions. The contract noted that the value of the opportunity was $21,254, which Martin noted in the May 2015 email. (Id. ¶¶ 27-29.)

Heap, however, did not receive credit for the iQor opportunity when she switched to the GAE role. See infra at 11. According to Heap, Martin, after discussing the issue with his superiors, selected her start date in the GAE role as June 1, 2015. (Id. ¶ 37.) Moreover, Martin, despite his discretion to pick a date in June, chose a closing date of May 27, 2015 for the iQor opportunity. (Id. ¶¶38-39.) This meant that Heap would not receive credit for the iQor opportunity as Martin had previously suggested.

Heap struggled in the GAE role, and her relationship with Martin deteriorated throughout the Summer and Fall of 2015. (See Def. 56.1 Stmt. ¶ 182.) According to Heap, this deterioration was the result of Martin's treating male colleagues and subordinates differently from the way he treated Heap. (Pl. SDF ¶ 128.) In

Heap's view, Martin was generally "jovial, sweet, and nice" with male colleagues, but not with her. (Id. ¶ 154.) For example, he would frequently go to lunch with male subordinates and with former male colleagues on other teams, such as Ken Williams ("Williams") and Frank Raneri ("Raneri"), (id. ¶ 152), but "never invited or otherwise attended lunch with Heap except when it coincided with a client lunch," (id. ¶ 150.) Martin also would joke with his male colleagues at work but would immediately stop joking if a woman walked into the room. (Id. ¶ 153.)

Similarly, Heap contends that Martin occasionally made offensive and discriminatory comments about women. For example, "Martin instructed Heap and [his other female subordinate] not to swear while making no such demands of male colleagues, and [] frequently swore himself." (Id. ¶ 128.) In another instance, Heap states that Martin told her that his wife worked a full-time job while taking care of their four children. When Heap told Martin that this made his wife a "super achiever," Martin said that raising their children was "her job." Taking this to mean that Martin felt that his wife's primary role was in the home, Heap chastised Martin for the comment. (Id. ¶ 223.) Heap also thought that Martin would "roll his eyes" at women if he did not like their outfits. (Id. ¶ 224.)

In Heap's telling, Martin's discriminatory conduct extended to his oversight of her work. For example, Heap avers that Martin

"berated [her] constantly" but would rarely yell at male subordinates. (Id. ¶ 133; see also Def. 56.1 Stmt. ¶ 185 (citing Heap's deposition testimony in which she claims Martin snapped at her and made snide comments about her).) Similarly, unlike with male colleagues, Martin would wait to tell Heap about issues with her work only after she had completed the relevant task and sometimes would ask her to start assignments over. (Pl. SDF ¶ 129.) Martin also apparently refused to train Heap on the Company's corporate terminology and excluded Heap from emails, training sessions, and internal meetings where male subordinates were included. (Id. ¶¶ 130-31.) Similarly, Heap states that Martin excluded her from client correspondence and client meetings, sometimes to the concern of clients. (Id. ¶ 135.)

Heap further states that Martin ran a "boys club" through which he sought to "boost the financial performance and success of his male colleagues at the expense of Heap." (Id. ¶ 129.) For example, in January 2016, Martin requested--or, rather, insisted--that Heap partner with Raneri, who was a friend of his. (Id. ¶ 136.) Raneri was on a different sales team from Martin but reached out to Martin about providing information about an opportunity to the individual on Martin's sales team--Heap--who was working on the Legal Aid Society account. (Id ¶ 137.) When he received the email, Martin, without checking in with Heap first, instructed Raneri that he should split the opportunity with Heap. (Id.)

Heap was uncomfortable with the idea of working with Raneri. First, she felt that Martin was forcing her into acquiescing to the arrangement and was especially upset because the split would mean that Raneri would obtain 50 percent of any commissions that they earned from the account. (Id. ¶ 143.) Second, she felt that she had a stronger background than Raneri did with the relevant account, as demonstrated by the fact that she had previously discussed details with representatives from the Legal Aid Society. (Id. ¶ 142.) Heap felt that she had been successful on the account, as "[u]p to that point nobody previously handling the account had come closer in securing any new deals for [the relevant] services with the Legal Aid Society." (Id.) When Heap agreed to work with Raneri, she told Martin that it would have been nice if he had run it by her first." Martin responded tersely: "You are welcome for [my] allowing you to participate in this opportunity." (Id. ¶¶ 143-44.)

In January 2016, Martin made the decision that he wanted to put Heap on a corrective action plan ("CAP") due to her sub-standard performance in the role. (Id. ¶ 169.) Up until that point, Heap had not closed a sale with a new client. (Id. ¶ 198.) Martin reached out to a human resources employee at the Company, identifying the following issues with Heap that would necessitate corrective action: (1) her poor sales performance; (2) her failure to timely complete tasks; (3) her failure to adhere to standard

office hours; (4) her argumentative and combative behavior; (5) her inability to learn new information about Company processes; (6) her lack of initiative to adjusting to the Company's sales strategy; and (7) her difficulty working with others and support staff. (Def. 56.1 Stmt. ¶ 144.) Human resources instructed Martin to include in the CAP a written warning to Heap about her performance as well as a performance improvement plan ("PIP"). (Pl. SDF ¶ 170.)

On February 3, 2016, Martin discussed the goals of the CAP with Heap.[2] The following day, Martin sent a written confirmation to Heap detailing the corrective plan. (Id. ¶ 175.) The CAP itself noted the following:

> Overall, Stephanie has not adapted well to being in sales at CenturyLink. Management has tried using Stephanie in different roles in an effort to put her in the best position to succeed. [Heap] [h]as not met timeline for tasks: 2016 goals, SBDC program, CEP Opt In. Overall, [Heap's] attitude and respect towards management is poor and non compliant. Stephanie is bordering on being a negative influence in the office environment and continuously operates against management's wishes and coaching.

---

[2] Heap's Local Rule 56.1 Statement of Disputed Facts appears to suggest that the CAP and the PIP were distinct remedial measures, and implies that Martin suddenly decided to put her on a CAP rather than a PIP. For example, she disputes that Martin's original inquiry discussed a CAP because it only mentions a "performance improvement plan." (Pl. 56.1 Opp. ¶ 144.) This is incorrect. Heap's CAP included a written warning and a PIP, and the CAP itself supports this contention. (Def. 56.1 Stmt. ¶ 145; Martin Decl. at Ex. 14.)

(See Declaration of Thomas J. Martin in Support of Motion for Summary Judgment ("Martin Decl."), dated June 4, 2019 [dkt. no. 46] at Ex. 14.) In a section on "Performance Expectations," the CAP tasked Heap with improving her sales performance, completing tasks on time, improving her communication skills, and arriving to the office on time. (Id.) The CAP emphasized that "[f]ailure to meet these or any other expectations . . . may result in further corrective action, up to and including termination of [] employment." (Id.)

After he put Heap on the CAP, Heap contends that Martin tried to "intentionally sabotage Heap's accounts to decrease her performance abilities and manage her out." (Pl. SDF ¶ 210.) For example, Martin again "demanded" that Heap partner with another coworker, this time with Williams—-another one of Martin's former sales team colleagues. (Id. ¶ 149.) Through this arrangement, Martin took over three large accounts from Heap, including client accounts for Sirius, Guardian Life, and Marsh & MacLennan. (Id. ¶ 155.) Heap contends that Martin "orchestrated" the partnership so that he could use Heap, who was performing well, to prop up Williams' "dismally low" sales quota. (Id. ¶ 156.) Specifically, Heap was upset that she was forced to prop up Williams—-who was a GAM and not a GAE—-and his 10 percent sales attainment rate. (Id. ¶ 157.) She was also upset because splitting deals with Williams would "cut her pipeline." (Id. ¶ 206.) She similarly suggests

that "[b]y requiring Heap to partner on deals with Williams in February on numerous accounts following his placement of Heap on a CAP, Martin hurt Heap's chances of improving her performance attainment" because she would be splitting with Williams. (Id. ¶ 215.)

Heap also suggests that Martin excluded Heap from emails and other client interactions after he put her on a CAP in February 2016. (Id. ¶ 211.) For example, Heap felt that Martin cut her out of various communications with a client consultant at Guardian Life in late February 2016. (Id. ¶ 212.) On another occasion, Martin apparently included Williams instead of Heap in a meeting with representatives from Marsh & MacLennan in February 2016. Martin allegedly did this despite the fact that Heap (1) owned that client account; (2) had set up the meeting in question; and (3) had dedicated more of her time to the account than Williams. (Id. ¶ 213.) According to Heap, this negatively affected her relationship with the client, undermining her ability to do her job as a GAE. (Id. ¶ 216.)

On March 4, 2016, Plaintiff emailed various senior Company employees to alert them to Martin's purportedly discriminatory behavior. (Id. ¶ 219.) In the email Heap further stated that Martin had "a problem working with high performing women" and noted his "isolated and abusive" treatment of her. (Pl. SDF ¶ 219.) On March 8, 2016, Heap met with a senior manager who promised that he

would investigate but who allegedly also said that "Martin could not be discriminating against [Heap] based on her gender because '[Martin] is married and has children.'" (Id. ¶ 226-27.) After the meeting, the Company took no action against Martin and made no apparent effort to remedy the alleged discrimination. (Id. ¶ 230.)

Heap resigned from the Company on April 7, 2016.

### b. Unpaid Commissions

Heap also contends that the Company failed to pay her $112,233.79 in commissions for the iQor transaction, see supra at 4, and other opportunities. (See Pl. SDF ¶¶ 51, 55.)

Before proceeding further, the Court will review the basics of how commissions at the Company functioned. In addition to Heap's base salary, she was eligible to earn commission based on the terms and conditions of various agreements, including her 2015 and 2016 Sales Compensation Agreements and the Company's 2015 and 2016 Sales Compensation Master Guide. (See Declaration of Greg Maliniak ("Maliniak Decl."), dated June 5, 2019 [dkt. no. 39-4] at Exs. 1-4.) Sales representatives were eligible to earn commission based on multiple performance metrics, including (1) their sales quota attainment, (2) the respective Target Sales Incentive ("TSI"), and (3) various decelerators and accelerators. (Def. 56.1 Stmt. ¶ 7.)

At the Company, a sales representative's sales quota could be pegged to various metrics. The most common of these metrics was

Total Billed Revenue ("TBR") and Sales Order Value ("SOV").[3] When Heap was a GAM, her sales quota was tied to TBR. When she became a GAE, her quota was based on SOV. (Id. ¶¶ 10-13.) In order for Heap to receive sales quota credit for a certain sales metric, she would have had the specific sales metric as a quota requirement. Thus, if a given sales representative had a sales quota based on TBR, he or she would not receive credit against the quota for an opportunity that generated SOV, and vice versa. (Id. ¶ 14.)

A sales representative's TSI represents "the amount in commission that a sales representative received on an annual basis if he or she was at 100% of sales quota attainment." (Id. ¶ 17.) Thus, if a sales representative had a TSI of $50,000, they would receive $50,000 in commissions for reaching 100 percent of their sales quota using the relevant metric. (Id. ¶ 18.) However, when a sales representative did not achieve his or her full sales quota, the yearly commission payment did not decrease in a linear fashion, i.e., a representative who achieved 50 percent of his or her quota did not necessarily receive 50 percent of the TSI. (Id. ¶ 19.) Instead, various decelerators would decrease the TSI "exponentially" when a representative was below his or her quota.

---

[3] The internal mechanics of each of these metrics is not material to the claims at issue in this litigation, so the Court will not endeavor to explain them. What matters is that employees in different roles at the Company would have sales quotas pegged to different metrics.

(Id.; see also id. ¶ 20 ("[A] sales representative who was at 50%
quota for a year might have only earned 30% of the TSI in commission
after factoring in applicable decelerators.")

The Company had a contractually mandated dispute resolution
process if current or former employees had issues with their
commission payments. (See Declaration of Greg Maliniak ("Maliniak
Decl."), dated June 5, 2019 [dkt. no. 39-4] at Exs. 1-4.) By
signing the relevant Sales Compensation Agreements, which Heap
did, an employee agreed to be bound by the resolution process
explained in the Company's Master Guides and to "exhaust the
Company's Internal Resolution and Escalation process . . . before
initiating a claim for sales compensation." (Id. Exs. 1,2.)[4] The
Master Guides, in turn, detail that "Issue Escalation and
Resolution Process." (See, e.g., id. Ex. 4 at 100-01.)[5] According
to the Master Guides, those who are employed at the Company must

---

[4] In her Statement of Disputed Facts, Heap appears to suggest that
she is not bound by the terms of the Sales Compensation Master
Guides because she "never signed" them. (Pl. SDF ¶ 110.) If Heap
is indeed making that claim, it is plainly unavailing and borders
on being deliberately misleading. It is true that Heap did not
specifically sign the Sales Compensation Master Guides. But it is
undisputed that she executed both the 2015 and 2016 Sales
Compensation Agreements which, on their signature page, explicitly
state that "[b]y acknowledging [the] agreement" the signing
employee "affirm[s] that [he or she] . . . agree[s] to be bound by
. . . the relevant BU Master Guide." (See Maliniak Decl. Exs. 1,
2.)
[5] There is no material difference between the process described in
the 2015 and 2016 guides. For the sake of simplicity and brevity,
the Court will cite to the 2016 guide.

submit their issue internally to an Issue Tracking System ("ITS") no later than 30 days from the date on which the relevant final Sales Compensation payment statement was issued. (Id.) Former employees are instructed to contact, by phone or email, the Former Employee Sales Compensation ("FESC") team in the same timeframe. (Id.) Failure to submit an issue either through ITS or FESC meant that the employee "agree[d] (1) the relevant Sales Compensation is accurate; (2) the [d]eadline represents a reasonable time for [him or her] to raise issues; and (3) [he or she was] fully compensated under the terms of the Plan and [has] no additional claims or disputes regarding . . . Sales Compensation." (Id. at 27.)

Moving to the substance of the issue, Heap says that she did not become aware of the unpaid commissions until August 2015 when she identified the issue upon review of SalesForce data. (Id. ¶¶ 47, 56.) With respect to iQor, Heap noticed that she had not been credited with SOV credit, and thus had not gotten commission, for the opportunity. (Id. ¶ 47.) In September 2015, Heap reached out to Greg Maliniak ("Maliniak"), a Lead Sales Operations Analyst at the Company, to discuss the unpaid commissions. (Id. ¶ 48.) Later that month, Maliniak spoke to Martin about the issue; Martin said that "Heap lost the transaction because it closed prior to her job transition [to the GAE role] and eligibility date for accruing it." (Id. ¶ 48.) In other words, Martin told Maliniak that

because Heap was a GAM at the time the iQor opportunity closed, she did not receive SOV credit for her GAE role.

Heap also believes she was underpaid for other opportunities with other clients, which she also noticed in August 2015. (Id. ¶¶ 54, 56.) When she told Martin this, Martin told her that the reason she had not received commissions was "due to an administrative delay." (Id.) Throughout September and October 2015, Heap continued to press the issue with Martin and Maliniak. (See Id. ¶¶ 56-62.) In November 2015, a member of the Company's sales operations team told Heap that her commission had not been paid because her SOV credits were being attributed to a false sales ID number rather than Heap's actual ID number which had changed when she transitioned to the GAE role. (Id. ¶ 64.) The Company told Heap it would correct the issue. (Id. ¶ 65.)

The issue persisted until February 2016. (Id. ¶ 69.) The Company apparently concluded that Heap's SOV credits were somehow being assigned to Martin, rather than to Heap. (Id. ¶ 71.) A sales analyst told Heap later that month that he had completed a "manual calculation" for her "December payout" that amounted to just over $6,000 representing a 24 percent SOV. (Id. ¶ 74.) The Company paid Heap $6,391.68 on February 23, 2016, which was "for December paid in February." (Id. ¶ 78.)

Heap informed the Company that she was uncomfortable with those numbers and requested to schedule a call to discuss the issue.

(Id. ¶ 75.)  Heap did not receive a response and, on March 4, 2016, sent an email to senior personnel about the compensation issues.[6] Several weeks later, Heap was told that the $6,391 payout from February was "not enough to put her into chargeback during Close-out."  (Id. ¶ 78.)  Shortly before her departure from the Company in April 2016, Heap again asked to discuss her compensation issues. (Id. ¶ 79.)  On May 31, 2016—after Heap had left the Company—she received an additional payment of $3,766.20.  (Id. ¶ 80.)[7] Heap cannot recall if, while she was employed by the Company, she submitted a dispute about her commission payments to the Company's ITS as required under the Sales Compensation Master Guide.  (Id. ¶ 83.)  Heap states that, after she departed the Company, she called the telephone number she was directed to call in order to raise an issue with the FESC, see supra at 14, but the number was disconnected, (id.).  Heap notes that a former colleague of hers sent an email to the email address associated with the FESC and received a response from the Company, but does not state that she also emailed the FESC to raise her issues.  (Id. ¶ 84.)

---

[6] This was the same email in which Heap notified the Company of Martin's allegedly discriminatory conduct.  See supra at 10.

[7] In her Statement of Disputed Facts, Heap provides her own calculation of unpaid commissions.  She concludes that she was actually owed $125,100.00 in commission by the Company for her work between June 2015 and December 2015.  Of that balance, she acknowledges that the Company paid her $2,708.33 in December 2015; $6,391.68 in February 2016; and $3,766.20 in May 2016.  Subtracting those payments, the balance according to Heap is $112,233.79.  (See Pl. SDF ¶¶ 87-108.)

II.  <u>LEGAL STANDARDS</u>[8]

    a. <u>Summary Judgment</u>

Under Rule 56 of the Federal Rules of Civil Procedure, a court may grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find after drawing all reasonable inferences in favor of a non-movant that no reasonable trier of fact could find in favor of that party."  <u>Palmer/Kane LLC v. Rosen Book Works LLC</u>, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016) (citation and internal quotation marks omitted).

Courts "must be cautious in granting summary judgment in employment discrimination cases because, 'the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication.'"  <u>White v. Pacifica Found.</u>, 973 F. Supp. 2d 363, 372-73 (S.D.N.Y. 2013) (quoting <u>Eastmer v. Williamsville Cent. Sch. Dist.</u>, 977 F. Supp. 207, 212 (W.D.N.Y. 1997)).  Notwithstanding the need for caution, it is

_____

[8] Given the volume of claims in this action, the Court only utilizes this section to discuss general principles applicable to summary judgment.  The Court supplies more specific standards applicable to each individual claim in the relevant section discussing each claim.

well settled that "summary judgment may be appropriate even in the fact-intensive context of discrimination cases" and that "the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to . . . other areas of litigation." <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001) (citation and internal quotation marks omitted). To withstand summary judgment, an employment discrimination plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts" -- he "must come forth with evidence sufficient to allow a reasonable jury to find [his] favor." <u>Brown v. Henderson</u>, 257 F.3d 246, 252 (2d Cir. 2001) (citation and internal quotation marks omitted).

III. <u>DISCUSSION</u>

    a. <u>Claims Against CenturyLink, Inc.</u>

As a threshold matter, the Court concludes that Plaintiff has established claims against Defendant Centurylink, Inc. Defendant has argued that Heap "has not established and cannot establish that CenturyLink, Inc. was [her] employer or that CenturyLink, Inc. engaged in any of the acts or omissions that are the subject of [her] claims." (MSJ at 27.) However, as Heap points out, her offer letter was on CenturyLink letterhead and expressly mentions that Heap was being offered "conditional employment . . . with CenturyLink." (<u>See</u> Opp. at 30.) Similarly, Heap's Sales

Compensation Agreements were between her and CenturyLink and made mention of distribution to CenturyLink employees. (Id.) Indeed, Heap's own CAP states that Heap did not "adapt[] well to being in sales at CenturyLink" and emphasizes "CenturyLink Policies and Procedures." (Martin Decl. at Ex. 14.) As such, a reasonable finder of fact could conclude that CenturyLink was Heap's employer for purposes of her various claims.

b. Disparate Treatment Claims Under the NYSHRL & NYCHRL

The Company's motion for summary judgment is GRANTED with respect to Heap's claims of disparate treatment under the NYSHRL and the NYCHRL.

The burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), governs gender discrimination claims under the NYSHRL. Under that framework, plaintiffs have "the burden of proving by the preponderance of the evidence a prima facie case of discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (emphasis added).[9] To establish a prima facie case for gender-based discrimination under the NYSHRL, Heap must demonstrate that "(1) [s]he is a member of a protected class; (2) [s]he was qualified

_____

[9] The standards governing claims under the NYSHRL and under federal law, i.e., Title VII, are coextensive. See Henry v. NYC Health & Hosp. Corp., 18 F. Supp.3d 396, 413 (S.D.N.Y. 2014)("[T]he standards of liability are identical under Title VII and the NYSHRL."). The Court will thus occasionally rely on cases evaluating claims brought under Title VII in its analysis.

for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination." Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012) (citation and internal quotation marks omitted). Once a Plaintiff establishes a prima facie case of gender-based discrimination, the burden then shifts to the employer to demonstrate a "legitimate, nondiscriminatory reason for the adverse employment action." Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 687-88 (S.D.N.Y. 2011) (citation and internal quotation marks omitted). If the employer can put forward legitimate reasons for an adverse employment action, the burden again shifts to the plaintiff to show that those justifications amount to "pretexts" for discrimination. Id.

The burden of making out a prima facie case under the NYSHRL is "not onerous," Burdine, 450 U.S. at 252-53, and the Court finds that Heap has met that manageable bar here. As an initial matter, the Court disagrees that Heap did not suffer an "adverse employment action." (See MSJ at 5-8.) First, the Company argues that its decision to place Heap on a CAP could not constitute an adverse employment action because it did not "materially affect the terms and condition[s] of employment or lead to an immediate tangible harm." (Id. at 5 (citing Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002)). Second, the Company posits that Heap's

20

eventual resignation could not amount to an adverse employment action because she was not constructively discharged from her job. (Id. at 6.)

On the first score, the Company notes that a CAP is a "formal performance management tool" which can include a range of "performance management action" including "written warning[s], performance improvement plan[s] ("PIP[s]"), and formal warning[s]." (Def. 56.1 Stmt. ¶ 143.) Heap's CAP included a PIP and a written warning. (Id. at 145.) Generally, however, "placement on a PIP, without more, does not constitute an adverse employment action." Kalola v. Int'l Bus. Machines Corp., No. 13 Civ. 7339(VB)(LMS), 2017 WL 3394115, at *9 (S.D.N.Y. Feb. 28, 2017) (collecting cases). But Heap does adduce evidence of something more: that, while she faced termination under the CAP if she did not reach certain performance metrics, Martin undermined her efforts to meet those goals in a variety of ways, including by "requiring she share accounts" with other employees and excluding her from client meetings, training sessions, and internal meetings. (See Opp. at 9, 12-13.)[10] On the latter score, the

---

[10] The Court notes that Heap primarily buttresses these allegations with citations to her own declaration. That testimony is self-serving does not mean that it should be disregarded for purposes of summary judgment, as it is nonetheless admissible evidence. Yang v. Navigators Grp., Inc., 674 F. App'x 13, 14-15 (2d Cir. 2016). Instead, "the self-serving nature of a witness's statements goes to the statements' weight" at trial. In re Dana Corp., 574 F.3d 129, 154 (2d Cir. 2009).

facts taken in a light most favorable to Heap also demonstrate that a jury could find those actions had a  material effect on the terms and conditions of Heap's employment, see Treglia, 313 F.3d at 720, because the sharing of accounts caused her to "lose performance attainment credits on which her employment status was evaluated [under the PIP]," (Opp. at 9.)

Thus, the Court declines to grant summary judgment on the ground that Heap's CAP--which included the PIP--was not an adverse employment action for NYSHRL purposes.  While the general goal of a PIP is to "improve [an employee's] performance and avoid [her] termination," Szarzynski v. Roche Labs., Inc., No. 07 Civ. 6008 (MAT), 2010 WL 811445, at *7 (W.D.N.Y. Mar. 1, 2010), a reasonable juror viewing these facts in the light most favorable to Heap could find that the same assumption does not hold where the employee subject to the PIP is actively undermined by management.  Indeed, in such an instance a reasonable juror could find that the PIP amounts to a de facto termination that would certainly constitute an adverse employment action under the NYSHRL.[11]

The Court also disagrees that Heap has failed to demonstrate an inference of discrimination for purposes of making a prima facie

_____

[11] Because the Court finds that Heap was subject to an adverse employment action for purposes of setting forth a prima facie case under the NYSHRL, it need not reach the Company's alternative argument that Heap did not suffer a "constructive discharge" from her employment.

case, though the margin is razor thin. (See MSJ at 8-12; see also Reply at 7-11.)  Heap has testified that Martin was in engaged in a course of conduct that systematically benefitted Heap's male colleagues at her expense.  (Opp. at 12-13.)  For example, Heap has suggested that Martin invited male colleagues to training sessions and meetings, but not her, and that he was more strict with her than he was with male colleagues.  (Id.)  Similarly, while isolated and admittedly far less derogatory than the types of lewd comments traditionally seen in gender discrimination actions, Martin's purportedly sexist comments about the role of women, if credited by the jury, could serve to buttress Heap's assertion that Martin acted with discriminatory intent. (See id. at 13-14 (citing and quoting Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998)(When "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance.").

Heap, however, stumbles in the next stage of the McDonnell Douglas analysis.  The Company has cited a litany of non-discriminatory reasons for its treatment of Heap, including deficiencies such as:

> [P]oor sales performance; failure to timely complete tasks;
> failure to adhere to standard office hours; argumentativeness
> and combativeness in coaching sessions; slow to adapt and
> learn new information about processes and product; lack of

initiative to adapt to the Company's strategy; and difficult
working with others and support staff.

See Def. 56.1 Stmt. ¶ 144.  In response, Heap has failed utterly

to produce evidence that would allow a jury to conclude that these

reasons were "mere pretext for actual discrimination." Weinstock

v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

First, Heap's evidence of pretext amounts to little more than

a list of events and a conclusory assertion that those events

demonstrate pretext.  Heap's evidence that the Company's

justifications are pretextual center exclusively around her

performance (and her performance relative to others at the

Company). (See Opp. at 18-19.) Specifically, Heap cites as

"compelling evidence" of pretext the following:

> Specifically, despite Martin's claim that she was at 62% MRC
> for performance attainment and had to rise to 70% in the first
> quarter of the year, she was already at 87% with an extensive
> pipeline in place . . . When Heap's colleagues were later put
> on CAPs and performance plans their performance was abysmal
> in comparison and they were mandated to improve to numbers
> far below the number Heap was already at when she was put on
> a plan . . . Additionally, no other individuals were put on
> CAP during Heap's employment despite the fact that many were
> performing far worse and granted exception upon exception .
> . . Further, Martin's false claims of 'performance issues'.
> . . and efforts to sabotage Heap's performance at and
> following her placement on CAP belittle any argument with
> respect to the further action and termination he sought for
> her based on supposed performance after he put her on the
> CAP.  Finally, when Williams was given exceptions for his
> failing performance time and again, the procedure followed
> was consistent with managers receiving lists and exception
> forms to complete.

(See Opp. at 18 (internal citations omitted).)  After rattling off these actions, however, Heap concludes simply that "Defendants actions were pretextual" and moves on.  (Id. at 19.)  This is insufficient.  It is well-settled that "[j]ust because one is treated differently around the office, is granted different bonuses, or is terminated while others are retained does not, without more, demonstrate discrimination."  Mattera v. JP Morgan Chase Corp., 740 F.Supp. 2d 561, 575 (S.D.N.Y. 2010) (citation omitted).[12]  And here, even acknowledging inconsistent treatment by the Company, Heap does not provide any evidence beyond self-serving, conclusory statements to demonstrate that the Company's justifications amount to pretext.  While the Court of Appeals has cautioned that "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated," the summary judgment rule would be "rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."  Meiri v. Dacon, 759 F.2d

---

[12] See also Moore v. Kingsbrook Jewish Med. Ctr., No. 11 Civ. 3625 (MKB), 2013 WL 3968748, at *13 (E.D.N.Y. July 30, 2013) ("[T]he fact that an employee 'disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.'" (citations omitted)).

989, 998 (2d Cir. 1985).  That guidance applies with particular force here.

Second, even assuming *arguendo* that this evidence does demonstrate pretext with regard to the Company's performance-related justifications, it does nothing to diminish the Company's other legitimate, non-discriminatory justifications which relate to Heap's attitude and her tardiness to the office.  In fact, the CAP itself demonstrates that her sales performance was of secondary concern, as it primarily focuses on other issues including the fact that Heap's "attitude and respect towards management is poor and non-compliant," that she "continuously operates against management's wishes and coaching," and she has "not met timeline for tasks."  (See Reply at 9 (citing Def. 56.1 Stmt. Ex. 13 at 542.)

Finally, Heap's own statement of disputed facts at points bolsters the Company's case.  For example, Heap acknowledges (as she must) that she did not close a sale to a new customer, i.e., her core responsibility as a GAE, during her employment with the Company.  (Pl. SDF ¶ 198 (noting that Heap was "not the only subordinate of Martin's who did not close a sale to a new customer during her employment.")  This lends credence to the Company's plainly non-discriminatory justification that she had poor sales performance in her GAE role.  Similarly, Heap takes issue with Martin's testimony that her "CAP was based in part on the fact

that she was late to the office and, unlike [another employee] who was also late to the office, never asked permission." (Id. ¶ 200.) However, Heap herself acknowledges that the other employee "was not late to the office and did not ask permission to be so," id., meaning the other employee's situation does nothing to undermine the Company's displeasure with Heap's late arrivals.[13]  If these facts are not themselves fatal to Heap's NYSHRL claim, they at least underscore why no reasonable juror could find that the Company's actions were pretextual.

For the same reasons, Heap's disparate treatment claims under the NYCHRL fail as well.  "The New York City Human Rights Law was intended to be more protective than the state and federal counterpart." Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 257 (S.D.N.Y. 2014) (quoting Bermudez v. City of New York, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011)). But even acknowledging the NYCHRL's "'uniquely broad and remedial purposes,' which go beyond those of counterpart State or federal civil rights laws," Williams v. New York Hous. Auth., 61 A.D.3d 62, 66 (N.Y. App. Div. 2009) (citations omitted), it still requires "some evidence from which discrimination can be inferred," Ben-Levy v. Bloomberg, L.P., 518 F. App'x 17, 20 (2d Cir. 2013).  Even under the more lenient

_____

[13] Heap also curiously avoids noting when she generally arrived at the office, only opting to state that she "worked at the office until 6PM or 8PM daily."  (Pl. SDF ¶ 202.)

auspices of the NYCHRL, Heap has failed to proffer evidence that would allow a jury to find that the Company acted with a discriminatory motive.

c. Hostile Work Environment Claims Under the NYSHRL & NYCHRL

The Company's motion for summary judgment is <u>GRANTED</u> with respect to Heap's claims of hostile work environment under the NYSHRL and the NYCHRL.

A hostile work environment exists under the NYSHRL "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Redd v. N.Y. Div. of Parole</u>, 678 F.3d 166, 175 (2d Cir. 2012) (internal quotation marks and alteration omitted); <u>see also</u> <u>Bermudez v. City of New York</u>, 783 F. Supp.2d 560, 578 (S.D.N.Y. 2011) (collecting cases). This is a strict standard: "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" <u>Schaper v. Bronx Lebanon Hosp. Ctr.</u>, 408 F. Supp. 3d 379, 397 (S.D.N.Y. 2019) (quoting <u>Clark County Sch. Dist. V. Breeden</u>, 532 U.S. 268, 271 (2001)). There is no fixed standard for what amounts to a hostile work environment for NYSHRL purposes; instead, courts must evaluate the totality of the circumstances,

including the frequency, severity, and offensiveness of the allegedly discriminatory conduct. Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

In opposition to the Company's motion for summary judgment, Heap supplies a laundry-list of examples of conduct that she says cumulatively created a hostile working environment. Most notably, Heap says that Martin:

- Frequently went to lunch with male colleagues, but not with her;

- Often joked with male colleagues, but not with her;

- Made several (in her opinion) offensive comments about women, including one remark that his wife's job was "in the home";

- Used erroneous performance metrics in his evaluations of Heap;

- Placed Heap on a corrective action plan and, in the process, refused to provide exceptions for her that he provided for Heap's purportedly lower-performing male colleagues;

- Imposed more strict quota attainment requirements in Heap's corrective action plan than he did in the

corrective action plans of lower-performing male
colleagues;

- Regularly excluded Heap from client emails and client
meetings, and tried to replace her at client meetings
with lower-performing male colleagues;

- Refused to include Heap in internal training sessions
and meetings in which he included male colleagues; and

- Sought to boost the performance of male colleagues at
the expense of Heap.

(See Pl. SDF ¶¶ 129-30, 134, 171-209, 212-215, 217, 233-35; see
also Opp. at 12-13.)

Heap's NYSHRL hostile work environment claim fails as a matter
of law. First, many of Heap's complaints certainly amount to
"petty slights or inconveniences," Williams v. City of New York,
No. 11 Civ. 3456 (JSR), 2012 WL 2524726, at *7 (S.D.N.Y. June 26,
2012) (internal citation omitted), that would not discriminatorily
alter her working conditions for purposes of the NYSHRL. For
example, finding that Martin "lunch[ing] with his male
subordinates and colleagues but never [Heap], "jok[ing] and
[being] jovial with his male subordinates, but not Heap," (Pl. SDF
¶¶ 128, 144, 149-52), created a hostile working environment would
run directly counter to the maxim that the NYSHRL is not meant to
operate as a "civility code," Davis-Bell v. Columbia Univ., 851 F.
Supp.2d 650, 671 (S.D.N.Y. 2012). Similarly, no reasonable juror
could find that Martin's (at most) scattered comments about, for
example, his wife's child-rearing role or his preference that women

30

not curse, (Pl. SDF ¶¶ 223-24), were pervasive or offensive enough to support a hostile work environment claim under the NYSHRL. Even viewing them in a light most favorable to Heap, those comments were "isolated and sporadic incidents" that, even if "tasteless, meanspirited, and sound[ing] [in] ignorance and bias," Alvarado v. Mt. Pleasant Cottage School Dist., 404 F. Supp.3d 763, 782 (S.D.N.Y. 2019), did not occur with sufficient regularity to support a hostile work environment claim.

Heap's NYSHRL hostile work environment claim fails for a more fundamental reason: she has failed to demonstrate that the Company's behavior toward her was linked to her being a woman. "It is axiomatic that mistreatment at work, [including] subjection to a hostile work environment . . . is actionable under [the NYSHRL] only when it occurs because of an employee's sex, or other protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). The Company, as the Court described in the context of Heap's disparate treatment claims, has provided evidence of numerous alternative, non-discriminatory explanations for their treatment of Heap, most notably Heap's poor sales performance and her attitude. See supra at 24. Heap's only counter to these explanations is her assertion that she has "provided evidence of [Martin's] treating her less well than men . . . and participat[ing] in a 'boy's club' environment that was so extreme that he tried to force Heap to fail at her job and cause her

constructive termination." (Opp. at 21). Heap's bare say-so, once again, is no substitute for evidence. As was the case with her disparate treatment claims, see supra at 19-28, these types of conclusory statements, i.e., that Martin's conduct reflected his membership in a "boy's club," without more, do not enable a jury to assess objectively the conduct underlying the purportedly hostile work environment. See Kaur v. N.Y.C. Health & Hosp. Corp., No. 97 Civ. 6175 (LAP), 2010 WL 11589961, at *2 (S.D.N.Y. May 10, 2010) ("Testimony that is so vague and conclusory that it would not permit a fact-finder to objectively evaluate the Defendant's conduct cannot defeat a motion for summary judgment.")

The Court finds the Company's reference to Bir v. Pfizer convincing. (See Reply at 11-12 (quoting 510 F. App'x 29 (2d Cir. 2013).) There, the Court of Appeals reviewed the Western District of New York's grant of summary judgment on the plaintiff's NYSHRL hostile work environment claim. The plaintiff alleged the following in support of her claim:

> . . . that [her supervisor] falsely accused her of antagonizing her customers and lying about her schedule; interfered with the distribution of product samples to her; reduced her budget for educational programs; assigned her a less-desirable sales territory than similarly-situated male sales representatives; screamed at her; and subjected her to more frequent field-visit supervisions, for which he provided less warning than he did similarly-situated male sales representatives. Plaintiff also avers that [the supervisor] often socialized with male representatives, but that he never did the same with female representatives. Furthermore, plaintiff asserts that in the months leading up to her wedding in 2005, [her supervisor said "when women get married and

have children, their priorities change and they don't work as hard"].

See 510 F. App'x at 32. The Court of Appeals affirmed the district court's grant of summary judgment as to the hostile work environment claim because "the record [did] not support a finding that [the manager's] objectionable conduct toward plaintiff was based on sex." Id. at 33.

The same is true here with respect to Heap's analogous allegations. Heap has provided evidence that Martin (and others at the Company) engaged in a range of conduct that frequently favored her male colleagues. To be sure, taking the facts in a light most favorable to her, Heap has shown that Martin was an ineffective manager, that he could be churlish with her, and that he played favorites with his former sales team colleagues at her expense. But she has demonstrated nothing more than that. She has not "proffered evidence that [a discriminatory] motive underlay what she claims to be a severe and pervasive pattern of abuse," E.E.O.C. v. Bloomberg L.P., 967 F. Supp. 2d 816, 898 (S.D.N.Y. 2013), and accordingly provides the Court with no means to make the leap from "bad management" to "gender-based-discrimination."

Heap's hostile work environment claim under the NYCHRL is afflicted by the same fatal issue. While the NYCHRL has a broader remedial purpose than the NYSHRL, see supra at 27-28, and accordingly "imposes liability for harassing conduct that does not

qualify as 'severe or pervasive,'" Farrugia v. N. Shore Univ. Hosp., 820 N.Y.S.2d 718, 724 (N.Y. Sup. Ct. 2006), NYCHRL plaintiffs must still "plead facts tending to show that actions that created the hostile work environment were taken against [her] because of a prohibited factor," Pouncy v. Advanced Focus LLC, No. 15 Civ. 6260 (JMF), 2017 WL 4280949, at *5 (S.D.N.Y. Sept. 25, 2017)(citations omitted). For the reasons discussed above, Heap has failed to adduce facts that would allow a jury to conclude, even under the NYCHRL's more lenient standards, that the Company's conduct was attributable to her being a woman. See id. at *5 (Dismissing NYCHRL hostile work environment claim where "conclusory assertions aside, [plaintiff] fail[ed] to allege--let alone substantiate--that any of the relevant acts of hostility by his supervisors 'were on the basis . . . of a protected characteristic.'") (quoting Nunez v. N.Y. State Dep't of Corr. & Cmty. Supervision, No. 14 Civ. 6647 (JMF), 2015 WL 4605684, at *16 (S.D.N.Y. July 31, 2015)).

The Court is mindful of the Court of Appeals' warning that the existence of a hostile work environment "presents mixed question[s] of law and fact that are especially well-suited for jury determination." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 605 (2d Cir. 2006) (internal citation and quotations omitted). Here, however--even assuming arguendo that the conduct she has cited rises to a level that would create a hostile work

environment--Heap has neglected to provide facts that demonstrate why that conduct can be attributed to her sex.  As a consequence, her hostile work environment claims under the NYSHRL and NYCHRL necessarily fail as a matter of law.

### d. Retaliation Claims Under the NYSHRL & NYCHRL

The Company's motion for summary judgment is <u>GRANTED</u> with respect to Heap's claims of retaliation under the NYSHRL and the NYCHRL.  Because the defects in Heap's retaliation claims are the same under both the NYSHRL and the NYCHRL, the Court will analyze both claims in tandem.

Under the NYSHRL, a <u>prima facie</u> case for retaliation requires: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  <u>Schaper</u>, 408 F. Supp. 3d at 390 (citations omitted).  The NYCHRL employs a laxer standard for establishing a <u>prima facie</u> retaliation claim, requiring only that "the employer engaged in conduct that was reasonably likely to deter a person from engaging in [a protected activity]."  <u>Mihalik</u>, 715 F.3d at 112.  However, "the NYCHRL [still] require[s] a causal connection between an adverse act and a protected activity to prove

a retaliation claim." <u>Dudley v. N.Y.C. Rous. Auth.</u>, No. 12 Civ. 2771 (PGG), 2014 WL 5003799, at *25 (S.D.N.Y. Sept. 30, 2014).

Heap's thesis with respect to retaliation very recently evolved--never an auspicious sign for a claim's chance of surviving summary judgment. In the First Amended Complaint, Heap alleged that the Company "retaliated against [her] for reporting of discrimination [in March 2016] . . . by placing her on a [CAP]." (<u>See</u> First Amended Complaint ("Compl."), dated February 21, 2018 [dkt. no. 10] at ¶ 35.) However, the Company pointed out on summary judgment that this theory is an impossibility because "the Company placed [Heap] on a CAP <u>more than a month before</u>" she reported the discriminatory behavior. (MSJ at 17 (emphasis in original).) Heap accordingly withdrew her allegation that her placement on the CAP was retaliatory, (Opp. at 22 n.7), and in its stead proffered a new theory: that the Company retaliated against her by "fail[ing] to address [her claims of discrimination]" and that Martin also retaliated by telling human resources that he wanted Heap fired, (<u>id</u>. at 22). That fresh coat of paint does not rescue Heap's retaliation claims from summary judgment.

As a starting point, this Court's analogous decision in <u>Winston v. Verizon Services Corp.</u> provides a crash course on how retaliation claims may <u>survive</u> a motion for summary judgment. There (as here) the plaintiff-employee brought retaliation claims against her former employer--Verizon--under the NYSHRL and NYCHRL.

36

See 633 F. Supp. 2d 42 (S.D.N.Y. 2009). The plaintiff, who like Heap had been placed on a PIP, was terminated from Verizon in April 2004 after she lodged several complaints with the company about alleged discriminatory behavior by her manager. Id. at *50-51. Of essential note, the plaintiff adduced evidence of a single instance where her manager confronted her at her desk shortly after she had returned from a meeting with human resources pertaining to his purportedly discriminatory conduct. In plaintiff's telling, her manager informed her that he knew about the meetings with human resources and stated that he would ensure that she did not pass her PIP, ensuring her eventual termination. Id. at *51.

Just as the Company has done here, Verizon moved for summary judgment on the retaliation claims. Verizon cited numerous non-discriminatory reasons for the plaintiff's termination such as "inadequate sales volume and client skills." Id. The Court, however, denied summary judgment on the retaliation claims, noting that there was "sufficient evidence to raise a triable issue of fact as to a causal connection between the plaintiff's complaints and her subsequent termination." Id. In the process, the Court cited as critical to its decision "the close temporal nexus between [plaintiff's] complaint" and the "[manager's] statement

immediately thereafter that he intended to ensure that she fail the PIP." Id.

By contrast, Heap has provided no evidence whatsoever that would allow a jury to link her March 2016 email reporting Martin and her eventual departure from the company. In support of her theory, she provides a solitary citation to several paragraphs in her Local Rule 56.1 Statement which roughly describe the following course of events: in March 2016, Heap contacted several senior managers requesting that they take action to stop Martin's supposedly discriminatory behavior; she had a meeting with a senior manager to discuss those issues at which the manager criticized Heap's well-documented performance issues; the senior managers did not take steps to remedy the alleged discrimination despite promising to investigate; Martin learned about the complaints; Martin commented in an email that he thought Heap should be terminated; and Heap (voluntarily) departed the company. (See Pl. SDF ¶¶ 219-235.) Unlike the plaintiff in Winston, however, Heap at no point adduces facts to suggest that the Company's approach to her report of discrimination was in any way a reprisal for her decision to come forward with her accusations. Tellingly, Heap's only argument that it was is remarkably circular--Heap suggests that "the causal connection between [the] events . . .

establish[es] [the requisite] causal connection quite strongly."
(Opp. at 21).  These defects are fatal to her retaliation claims.

> e. Potential Claim for Discriminatorily Lowered Salary Under the NYSHRL & NYCHRL

To the extent that Heap has attempted to raise claims for
discriminatorily lowered salary under the NYSHRL and NYCHRL in her
opposition to the Company's motion for summary judgment, the Court
dismisses those claims.  Heap's solitary mention of the issue is
a throwaway statement that the Company "lower[ed] her salary from
$110,000 to $87,000" when it reviewed her prior compensation and
. . . thereby enforce[ed] a pattern of keeping women underpaid .
. . which is now unlawful in New York City." (Opp. at 8.)  First,
and as a practical matter, Heap has provided no evidence from which
a jury could conclude that the Company's decision to pay her a
salary of $87,000 at the outset of her employment rather than
$110,000 was in any way motivated by discriminatory animus.
Second, as Defendants point out, any claim for a discriminatorily
lowered salary is time-barred.  The NYSHRL and NYCHRL have a
statute of limitations of three years. (See Reply at 2 n.1.)  Heap
received her offer of employment from the Company on November 3,
2014 and filed her First Amended Complaint in this action on
February 21, 2018. (See dkt. no. 10.)  Thus, there is no universe
in which Heap's putative claim for discriminatorily lowered salary
was filed within the applicable statute of limitations.

f. NYLL Claim

The Company's motion for summary judgment with respect to Heap's NYLL claims is <u>GRANTED IN PART</u> and <u>DENIED IN PART</u>.

Heap's NYLL claim under Section 193 does not survive summary judgment, as there is no genuine dispute as to whether Heap's allegedly owed commissions were deducted from her pay. NYLL Section 190(1) defines "wages" as "earnings of an employee for labor or services . . . whether the amount of earnings is determined on time, piece, <u>commission</u> or other basis." NYLL § 190(1) (emphasis added). Thus, Defendants may only deduct from Heap's wages if the deduction is permitted by law or by Heap's written agreement. <u>See</u> NYLL § 193(1)(a)-(b).

For NYLL Section 193 to apply, Heap must establish that (1) her commission was earned, thus rendering it a wage, <u>Pachter v. Bernard Hodes Grp., Inc.</u>, 10 N.Y.3d 609, 616-17 (2008) (explaining that a commission only becomes a "wage" within the meaning of Section 193 when it is earned by the employee), and (2) the employer made an unlawful deduction from the commission. <u>See</u> NYLL § 193(1). With respect to Heap's earning the commission, this is undoubtedly a question of disputed fact left to a jury. (<u>Compare</u> Opp. at 22 (claiming Defendants are liable for "the Company's withholding of her earned commissions"), <u>with</u> MSJ at 20 (stating that Heap has been paid all commissions she was owed).)

However, even if she had earned unpaid commission, Heap has failed to establish that the Company deducted from her commissions rather than failed to pay them.  Heap has put forth evidence of a disagreement between herself and Defendants as to the proper calculation of Heap's owed commissions.  But this does not properly trigger a Section 193 claim.  See Jankousky v. North Fork Bancorp., Inc., No. 08 Civ. 1858 (PAC), 2011 WL 1118602, at *4 (S.D.N.Y. Mar. 23, 2011) (finding that dispute over the calculation of wages is not a deduction under the NYLL because, "[u]ntil the wages are agreed upon, there can be no deduction").  The Court of Appeals has explicitly stated that Section 193 "'has nothing to do with failure to pay wages or severance benefits, governing instead the specific subject of making deductions from wages.'"  Malinowski v. Wall St. Source, Inc., No. 09 Civ. 9592 (PAE), 2012 WL 279450, at *3 n.5 (S.D.N.Y. Jan. 31, 2012) (quoting Monagle v. Scholastic, Inc., No. 06 Civ. 14342 (GEL), 2007 WL 766282, at *2 (S.D.N.Y. Mar. 9, 2007)).  Thus, Heap's NYLL claims under Section 193 must be dismissed as a matter of law.

Heap's claim under NYLL Section 191, however, survives summary judgment.  Section 191(1)(c) provides that every "commission salesperson shall be paid . . . commissions and all other monies earned or payable . . . not less frequently than once in each month and not later than the last day of the month following the month in which they are earned."  NYLL § 191(1)(c).  Heap and Defendants

dispute whether Heap's May 2016 commission payments constituted all that she rightfully earned pursuant to her employment contract. (See Opp. at 22; see also MSJ at 20.)  This question is ultimately one for a jury.  See Flannigan v. Vulcan Power Group, LLC, 642 F. App'x 46, 51-53 (2d Cir. 2016) (affirming a jury's interpretation of an employment agreement establishing grounds for a violation of Section 191(1)(c)).  As Defendants themselves alluded, Heap can sustain a claim under Section 191 if a jury determines that her commissions were "earned."  (See MSJ at 20 (citing Pachter, 10 N.Y.3d at 618).)

Accordingly, Defendants' motion for summary judgment is granted with respect to Heap's claim under Section 193 of the NYLL and denied with respect to Heap's claim under Section 191 of the NYLL.

g. Common Law Claims

For the following reasons, the Company's motion for summary judgment is GRANTED with respect to all of Heap's common law claims.

i. Quantum Meruit

Heap's claim for quantum meruit must be dismissed as a matter of law.  New York law bars recovery under a claim of quantum meruit where there is a valid, enforceable contract governing the same subject matter.  Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (citing Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co., 70 N.Y.2d 382, 388

42

(1987)); see also Hinterberger v. Catholic Health Sys., 536 F. App'x 14, 17 (2d Cir. 2013) (upholding dismissal of a quantum meruit claim for being "insufficiently distinct" from a breach of contract claim).  The claim is only barred insofar as the valid contract encompasses the dispute between the parties.  Mid-Hudson Catskill Rural Migrant Ministry, Inc., 418 F.3d at 175); see also Curtis Props. Corp. v. Greif Cos., 236 A.D.2d 237 (1st Dep't 1997) ("[A] party is not precluded from proceeding on both breach of contract and quasi-contract theories where . . . the contract does not cover the dispute in issue.").

Heap's quantum meruit claim fails here because it is premised solely on the fact that the Company allegedly denied her commissions.  (Compl. ¶¶ 13, 52-58.)  Heap does not dispute that her eligibility for receiving commissions was governed by the terms and conditions of her Sales Compensation Agreement and Sales Compensation Master Guide with Defendants.  (Def. 56.1 Stmt. ¶¶ 6-8; Pl. 56.1 Opp. ¶¶ 6-8.)

Notably, in lieu of defending her quantum meruit claim, Heap's opposition to Defendants' motion asserts a breach of contract claim stemming from the Company's purported nonperformance under the Sales Compensation Agreements and the Sales Compensation Master Guides.  (Opp. at 25-26).  Heap has made no assertion that her claim for quantum meruit falls outside the scope of those

agreements, and is thus sufficiently distinct from the breach of contract claim she now asserts.

Thus, summary judgment is granted for Defendants with regards to Heap's quantum meruit claim.

### ii. Breach of Contract

The Court also grants summary judgment on Heap's breach of contract claim. The Court of Appeals recognizes that a party may not amend its complaint by asserting a new claim in its opposition papers to a dispositive motion. Avillan v. Donahoe, 483 F. App'x 637, 639 (2d Cir. 2012) (affirming a district court's denial of plaintiff's claim raised for the first time in plaintiff's opposition to summary judgment); Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998) (denying plaintiff's right to assert a new claim in her opposition to a motion to dismiss).

Here, Heap did not raise a breach of contract claim in her complaint. (Compl. ¶¶ 30-62.) She argues the Court should consider her claim nonetheless because the Company was sufficiently on notice that Heap would allege a breach of contract. (Opp. at 25 n.9.) In contemplating acceptance of Heap's new claim, the Court should "consider whether doing so would prejudice the defendant." Stratton v. Ernst & Young, LLP, No. 15 Civ. 1047 (VEC), 2016 WL 6310772, at *6 (S.D.N.Y. October 27, 2016). Because she raises the claim on Defendants' motion for summary judgment after discovery has ended, Heap's breach of contract claim

prejudices the Defendants and should not be permitted. See Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) ("[A]t the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.").

Even if the Court were to permit Heap's claim, it would fail as a matter of law. Heap states that she "does not recall whether she initiated the issue escalation process prior to her employment termination." (Opp. at 25; Pl. SDF ¶ 83.) But the plain language of the 2015 and 2016 Sales Compensation Agreements—which Heap executed—required her to utilize that process for Heap to pursue a claim for breach of contract. (See Declaration of Greg Maliniak ("Maliniak Decl."), dated June 5, 2019 [dkt. no. 39-4] at Ex. 1 § 7 ("The Company and Plan Participant agree to exhaust [the] internal process prior to commencing a demand or claim"); see also id. at Ex. 2 § 7 (same).) Heap appears to suggest that the Company did not put her on notice of her obligations under the dispute resolution process, noting that the Company only "instructed her" to initiate the issue escalation process for one commission, (Opp. at 25.) But the Sales Compensation Master Guides plainly state

that it is "[the employee's] responsibility to preserve [his or her] right to escalate or dispute any Sales Compensation issues," not the Company's.[14] Heap also seems to believe that she can create an issue of material fact by saying that she does not recall whether she initiated the issue escalation process prior to the termination of her employment. (Id. at 25.) That Heap does not recall initiating the contractually required dispute resolution process, however, is not a substitute for evidence that she did so.

Following the termination of her employment, the Company's 2015 and 2016 Sales Compensation Master Guides required Heap to submit a claim through the "Former Employee Sales Compensation (FESC)." (Id. Ex. 3 at 64; id. Ex. 4 at 101.) )[15] While Heap stated she called the FESC, she alleges the provided phone number was disconnected. (Pl. SDF ¶ 83.) Despite her awareness that the FESC also had a contact email address, Heap is provides no evidence that she attempted to use it. (Pl. SDF ¶ 84.) Heap otherwise relies on the assurance of Defendants and "Sales Compensation personnel" who were assisting with evaluating her compensation

---

[14] Heap appears to argue that she was not required to utilize the contractual dispute resolution procedures at issue because her payments were "partial payments" and thus not "final" for purposes of the relevant agreements. (See Opp. at 26.)
[15] "Your rights under the Plan will not be preserved because you are waiting for answers to questions or waiting for additional information that you have requested outside the ITS process." (Maliniak Decl., Ex. 3 at 64.)

issues to argue that she did not actually need to initiate the process.  (Opp. at 25-26; Pl. SDF ¶¶ 64-78.)  However, the Sales Compensation Master Guides states explicitly that "[r]aising an issue to any level of management is not sufficient to preserve your rights under the Plan – you must submit your dispute to ITS or FESC." (Maliniak Decl., Ex. 3 at 63; id. Ex. 4 at 100.)  Failure to do so represents a contractual concession that Heap was fully compensated.  (Maliniak Decl., Ex. 3 at 65; id. Ex. 4 at 102.)[16]

Thus, Heap has adduced no facts that would allow a jury to conclude that she fulfilled the prerequisites for her breach of

---

[16] If that were not enough, Heap's putative breach of contract claim would likely be time-barred, though the Court does not reach the issue.  As Defendants point out, "New York law permits parties to shorten the six-year statute of limitations for breach of contract by agreement."  See N.Y. CPLR § 201.   The relevant agreements plainly state that any lawsuit under the relevant agreements must be brought within six months of a final decision of the Company's Sales Compensation Review Board ("SCRB"), the "final step in the internal issue resolution process." (Maliniak Decl., Ex. 3 at 65; id., Ex. 4 at 102.)  The SCRB would only decide issues that had been submitted through the ITS or the FESC.  (Id.)
    Of course, Heap did not submit the issue through the ITS or the FESC and thus never received a final decision from the SCRB. Thus, we can never know when exactly a final decision would have issued and when the six-month clock would begin running.  However, had Heap properly escalated her issues in the first instance, she would have received a decision through the ITS or FESC process within 30 calendar days.  (Id.)  From there, she would have had 14 calendar days to escalate the issue to the SCRB.  Under the terms of the relevant agreements the SCRB's decision would then be communicated "within 30 calendar days from the date the issue is reviewed."  (Id.)  Given that Heap received her final payment on May 31, 2016, and given that she initiated the present action on February 21, 2018, it seems exceedingly unlikely that her breach of contract claim is timely.

47

contract claim.  Accordingly, summary judgment is granted to Defendants for any breach of contract claim that Heap seeks to allege.

### iii. Theft, Conversion, and Misappropriation

New York common law does not recognize a distinct claim of civil theft, instead treating it as synonymous with the recognized claim of conversion.  See Shmueli v. Corcoran Group, 802 N.Y.S.2d 871, 875 n.2 (Sup. Ct. 2005) ("The basic essence of conversion is civil theft."); Smith Barney, Harris Upham & Co., Inc. v. Luckie, 245 A.D.2d 17, 19 (1st Dep't 1997) (recognizing conversion as "the New York analogue of" civil theft).

Similarly, misappropriation and conversion can be treated as a unified claim.  See Danovitch v. Gersten Savage LLP, 2013 NY Slip Op 31519(U) (Sup. Ct. N.Y. Cty. July 8, 2013); Hinkle Iron Co. v. Kohn, 229 N.Y. 179, 184 (1920).  Regardless, Heap provides no facts supporting a misappropriation of funds beyond those alleging a conversion, nor does she defend the misappropriation claim in her opposition to summary judgment.

The Court accordingly concludes that Heap's conversion claim fails as a matter of law.  "New York law is clear, seeking to enforce an 'obligation to pay' does not raise a claim for conversion."  Fantozzi v. Axsys Techs., Inc., No. 07 Civ. 2667 (LMM), 2008 WL 4866054, at *9 (S.D.N.Y. Nov. 6, 2008).  Such claims are to be dismissed if a plaintiff is "essentially seeking

enforcement of the contract terms." Id. at *10 (granting summary judgment against a conversion claim because "[p]laintiffs [did] not establish that the [d]efendant breached a legal duty separate from the contract itself"); see also Seat Sack, Inc. v. Childcraft Educ. Corp., No. 07 Civ. 3344 (DFE), 2010 WL 245576, at *10 (S.D.N.Y. Jan. 22, 2010) (same).

Regardless, a conversion claim for money only survives if plaintiff had "ownership, possession or control of the money" prior to the conversion. Fantozzi, 2008 WL 4866054 at *9 (internal quotation and citation omitted). An obligation to be paid does not equate to a plaintiff's ownership, possession or control of the money in question. See id.(determining plaintiffs were not in control of funds just because they were allegedly owed profits from the sale of their business); see also Peters Griffin Woodward, Inc. v. WCSC, Inc., 88 A.D.2d 883, 883-84 (N.Y. App. Div. 1982) (laying out New York conversion law and finding plaintiff did not have control of commissions allegedly owed to him).

Here, Heap's conversion claim is for $112,233.79, "constituting commission payments pursuant to and calculated subject to . . . the Compensation Agreement." (Opp. at 29.) Thus, even Heap does not dispute that these monies are owed directly pursuant to her contractual agreement with Defendants. She has made no assertion that the monies owed stem from any obligation other than Defendants' "obligation to pay" under the Compensation Agreement.

As this was just an obligation to pay, Heap cannot show that she was in ownership, possession or control of funds she never received. Accordingly, Heap cannot bring a conversion claim to enforce contractual obligations, and her conversion claim fails as a matter of law.

Heap misguidedly relies on Doo Nam Yang v. ACBL Corp., where an employer's wrongful deduction of $29 from each of plaintiff's paychecks constituted a conversion. 427 F. Supp. 2d 327, 341 (S.D.N.Y. 2005). The Court established conversion on finding that the exact amount demanded was "identifiable" and plaintiff had "immediate superior right" to the funds because they were deducted from his wages without cause.[17] Id. This was based, in part, on the finding that the plaintiff's own employer had acknowledged plaintiff's right to the money. Id. In contrast, Heap can point to no source that explicitly grants her an immediate superior right to the identified sum of $112,233.79, nor can Heap show that Defendants have acknowledged her right to be paid that sum. Rather, Heap's claim is more akin to those in Fantozzi and Peters Griffin Woodward, Inc., where the alleged right to profits or

_____

[17] Plaintiffs can sustain conversion claims if they can show they (1) "had legal title or an immediate superior right of possession to [an] identifiable fund," and (2) there was an "exercise by defendants of unauthorized dominion over the money in question to the exclusion of plaintiff's rights." Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 341-42 (S.D.N.Y. 2005) (quoting Bankers Trust Co. v. Cerrato, Sweeney, Cohn, Stahl & Vaccaro, 187 A.D.2 384 (N.Y. App. Div. 1992)).

commissions was insufficient to establish a conversion. See Fantozzi, 2008 WL 4866054 at *9-10; Griffin Woodward, Inc., 88 A.D.2d at 883-84.

Accordingly, summary judgment is granted for Defendants against Heap's claims for civil theft, misappropriation and conversion.

### iv. Constructive Trust

Heap cannot sustain a claim for constructive trust. New York law imposes four requirements that a Plaintiff must prove to establish a constructive trust: (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer made in reliance on the promise; and (4) unjust enrichment. United States v. Coluccio, 51 F.3d 337, 340 (2d Cir. 1995). These requirements are generally considered only guideposts. Id. However, a plaintiff who cannot establish a fiduciary relationship "generally cannot establish a constructive trust claim." Rosenblatt v. Christie, Manson & Woods Ltd., 195 F. App'x 11, 13 (2d Cir. 2006).

Ultimately, "the purpose of the constructive trust is prevention of unjust enrichment." Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.), 377 F.3d 209, 212 (2d Cir. 2004) (quoting Simonds v. Simonds, 45 N.Y.2d 233, 242 (1978) (internal quotation omitted)); In re Koreag, Controle et Revision S.A., 961 F.2d 341, 354 (2d Cir. 1992) (branding unjust enrichment the "key factor" in deciding to impose a constructive trust claim). A claim for

constructive trust, premised upon unjust enrichment, is barred when there is a relevant written agreement. See, e.g., Boccardi Capital Sys. v. D.E. Shaw Laminar Portfolios, L.L.C., 35 F. App'x 516, 519 (2d Cir. 2009) (precluding a constructive trust claim because of "the existence of an express written agreement governing the subject matter at issue"); Rosenblatt, 195 F. App'x at 13 ("Furthermore, plaintiff is not entitled to a constructive trust because the rights of the parties here are based on a written agreement."); Superintendent of Ins., 377 F.3d at 213 ("[T]he existence of a written agreement precludes a finding of unjust enrichment [which] applies to constructive trust claims.")

Here, Heap has failed to prove that her employer-employee relationship rose to the level of a fiduciary relationship. See Burian v. Kurtz, No. 85 Civ. 9223 (KTD), 1990 WL 74549, at *6 (S.D.N.Y. May 31, 1990) (stating that the mere employer-employee relationship between a boss and employee does not create a fiduciary relationship for constructive trust). "There is no fiduciary relationship where a purely commercial or business relationship exists." Id. Regardless, the Compensation Agreement's existence bars Heap's ability to assert a constructive trust claim. See Boccardi Capital Sys., 35 F. App'x at 519. Like her other common law claims, this claim is premised on "the commissions she is owed." (Opp. at 30.) These commissions, as per Heap, are governed by the written Compensation Agreement. (Id.

at 29.)  Since any assertion of unjust enrichment is barred by her written contract, Heap cannot allege entitlement to a constructive trust.

As such, summary judgment is granted to Defendants on Heap's claim for constructive trust.

IV.  <u>CONCLUSION</u>

For the reasons detailed above, Defendants' motion for summary judgment [dkt. no. 39] is <u>GRANTED IN PART</u> and <u>DENIED IN PART</u>. Specifically:

- Defendants' motion for summary judgment is <u>GRANTED</u> with respect to Plaintiff's claims under the NYSHRL and NYCHRL, including any potential claim related to discriminatorily lowered salary;

- Defendants' motion for summary judgment is <u>GRANTED</u> on all of Plaintiff's common law claims for <u>quantum meruit</u>, breach of contract, conversion, and constructive trust;

- Defendants' motion for summary judgment is <u>GRANTED</u> on Plaintiff's claim for unpaid commissions under Section 193 of the NYLL.

- Defendants' motion for summary judgment is <u>DENIED</u> with respect to Plaintiff's claim for unpaid commissions under Section 191 of the NYLL.

To the extent that they are not addressed above, the Court has considered the parties' remaining arguments and found them unavailing.  Counsel for the parties shall confer and inform the court by letter no later than April 30, 2020, as to how they propose to proceed.  Counsel shall also provide a dial-in number

for a conference call with the Court on May 19, 2020, at 10:00 AM to discuss the status of the action, settlement, and any other remaining issues.

**SO ORDERED.**

Dated:    New York, New York
          March 27, 2020

_____

LORETTA A. PRESKA
Senior United States District Judge